# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHAEL A. CAMPBELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No.: CIV-22-399-R |
| ) | |
| OKLAHOMA COUNTY DETENTION ) | |
| CENTER, *et al.* ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF MARK WINCHESTER, M.D.

I, Mark Winchester, being of legal age and duly sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, attest and state as follows:

1. I am a medical doctor license to practice in the State of Oklahoma. The statements contained in this Declaration are based on my personal knowledge and education, training, and experience.

2. At all times relevant to Mr. Campbell's Complaint, I was employed by Turn Key Health Clinics, LLC ("Turn Key") as a doctor to provide healthcare services to inmates, including those housed at the Oklahoma County Detention Center ("OCDC").

3. I am personally familiar with Mr. Campbell and the care and treatment I provided to him in February 2022 to May 2022.

4. At all times relevant to Mr. Campbell's Complaint, I have never personally observed any jail employee deny or delay access to medical care to Mr. Campbell.

5. At all times relevant to Mr. Campbell's Complaint, I have never personally observed any jail employee act deliberately indifferent to Mr. Campbell's medical condition.

6. At all times relevant to Mr. Campbell's Complaint, I never observed any Turn Key employee ever deny or delay Mr. Campbell's access to adequate medical care.

7. I never denied or delayed Mr. Campbell access to adequate medical care.

8. Mr. Campbell was booked into the OCDC on or around February 16, 2022.

9. During intake on February 16, 2022, Mr. Campbell informed Turn Key staff that took medications for mental health, hypertension, and diabetes mellitus, but he could not recall specific medication information. Per the intake records, Mr. Campbell showed no signs of an emergent condition, and his ease of movement was noted as "unremarkable".

10. On or about February 18, 2022, Mr. Campbell informed Turn Key staff that he had left hip pain related to degenerative disease for which he was receiving treatment with Dr. Ali at with the Oklahoma City VA Healthcare System prior to his incarceration. He stated Dr. Ali previously recommended a left total hip arthroplasty. Turn Key staff initiated a request for Mr. Campbell to be evaluated by me, and he was prescribed Acetaminophen 325 mg and Ibuprofen 200 mg for 7 days in the meantime.

11. My first real involvement in Mr. Campbell's care was on February 23, 2022 when I evaluated him. Mr. Campbell and I discussed Dr. Ali's diagnosis of degenerative disease in the left hip, as well as Dr. Ali's recommendation for a left total hip arthroplasty. I determined the surgery was not urgently necessary, particularly given the heightened risk of infection following surgery when in the jail setting. Because the pain was chronic and

not acute, surgery was not of an emergent nature. In Mr. Campbell's situation, the risks of surgery outweighed the medical benefits.

12. Due to the nature of his complaints, I recommended he utilize a second mattress for comfort and a cane to help him ambulate, which were provided. I also prescribed Meloxicam 7.5 mg for pain and inflammation.

13. Generally, medical providers do not prescribe narcotics to inmates housed within jails, including the OCDC, because these prescriptions can pose a significant safety and security threat to staff and other inmates due to the risk of diversion and/or abuse.

14. Mr. Campbell's pain levels were being appropriately treated with prescriptions of Acetaminophen 325 mg, Ibuprofen 200 mg, Meloxicam 7.5 mg, Naproxen 500 mg, and Methocarbamol 750 mg while at the OCDC, which are within the standard of care.

15. As a patient, Mr. Campbell was sometimes deceptive and noncompliant with treatment.

16. For instance, Mr. Campbell initially reported to Turn Key staff that he had diabetes mellitus for which he took insulin; however, he later admitted he lied about his diagnosis in an effort to manipulate the staff in order to get a sandwich.

17. Turn Key staff also noted refusal or noncompliance with medications on at least 18 occasions throughout Mr. Campbell's incarceration.

18. I was never aware of any additional symptoms or deterioration of Mr. Campbell's condition such that would change his treatment plan.

19. With regard Mr. Campbell's medical issues in the Complaint which are related to bed bug bites, Mr. Campbell was provided with Diphenhydramine 25 mg and Hydrocortisone cream 1% which are within the standard of care.

20. Throughout his incarceration at the Jail, Mr. Campbell received a continuous course of treatment from Turn Key medical staff which was consistent with and appropriate for his medical complaints.

21. OCDC's policy is to provide inmates with access to adequate medical care.

22. Turn Key's policy is to provide inmates with access to adequate medical care.

23. Turn Key does not now have, nor has it ever had, a policy, practice or custom of denying or delaying administration of prescribed medications to inmates who are booked into the Jail.

24. In my professional medical opinion, the care and treatment provided to Mr. Campbell during his incarceration at the Jail was appropriate, reasonable, within the standard of care, and was not indifferent to his medical needs.

I understand the statements in this Declaration are given under the penalty of perjury. All the foregoing statements are true and correct to the best of my personal knowledge. Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury under the laws of the United States of America, the foregoing is true and correct.

DATED this 6th day of March, 2023.

3/6/23

_____
Mark Winchester, MD
Turn Key Health Clinics, LLC